Justin Steffen
*Attorney for Plaintiff*
Steffen Legal Services, LLC
2100 SE Lake Rd. #5
Milwaukie, OR 97222
971-570-9225
info@steffenlegal.com

## UNITED STATES DISTRICT C2010OURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **JOAN SCHRADER** and **SPECIALTY FAMILY HOMES, LLC,**<br><br>Plaintiffs,<br><br>v.<br><br>**FARIBORZ PAKSERESHT**, in his official and individual capacity,<br><br>Defendant. | Case No.:  3:22-cv-01957-SB<br><br>**MOTION FOR PRELIMINARY INJUNCTION**<br><br>**FRCP 65**<br><br>**ORAL ARGUMENT REQUESTED** |

I, Joan Schrader, declare as follows:

I am one of the Plaintiffs in this case. I have owned Plaintiff Specialty Family Homes, LLC (SFH) since 2010.

The Office of Developmental Disabilities, ODDS, promulgated new rules to among other things, prohibit operations of "unlicensed foster care homes".  Adult foster care homes are residential facilities, where as a condition of living in the home, the individual must receive bundled attendant care services exclusively from the foster care provider. The foster care rule is OAR 411-360.

An alternative to foster care is ODDS's Community Living Supports service which is

**DECLARATION OF JOAN SCHRADER**
Page 1 of 9

hourly attendant care, OAR 411-450. Individuals in this service have historically been able to choose where they live and with whom they live because their hourly attendant care is independent of their living situation unlike residential services such as foster care.

Individuals who choose the Community Living Support Program as an alternative to residential programs have the freedom to hire and fire their providers of services, reduce or increase the hours assigned to different providers, and choose new providers at will. They can also move to a different home without losing their providers as long as they move to a location that is serviced by their provider.

ODDS's new rule re-defines shared living with a caregiver as "unlicensed foster care". ODDS has taken the position that an individual receiving hourly attendant care services in the Community Living Supports program is living in an "unlicensed foster care home" if the individual lives with one of their caregivers or any employee of a caregiving agency which delivers care to the individual. It is this living situation that is targeted by the new rules in the Community Living Supports program.

ODDS's position is not supportable because choosing to live with one of your caregivers or another employee of the caregiving agency that you use, does not turn your service into residential services such as foster care. This is true because an individual receiving hourly attendant care in the Community Living Supports program is free to change caregivers at will regardless of where they live or with whom they live as opposed to residential services which require the individual to receive services exclusively from the residential operator else the individual must move.

While ODDS does have a vital and legitimate interest to stop people from operating unlicensed foster care homes, it's interest does not reach to prohibiting individuals from living where they choose and with whom they choose, if they choose to live outside of residential facilities.

**DECLARATION OF JOAN SCHRADER**
Page 2 of 9

It is important to note that ODDS credentials all caregivers so if a person lives with one of their caregivers, they are not receiving "unlicensed" care.

SFH currently provides community-based hourly attendant care services to five high needs disabled individuals who reside in the homes of their caregivers. SFH employs these caregivers (and other caregivers who do not reside with the disabled individual), paying them wages, and in turn receives reimbursement from the state of Oregon under the 'Community First Choice Medicaid Program' (known in Oregon as the 'Oregon K Plan'). SFH, myself and the disabled people we care for will suffer irreparable harm if the preliminary injunction is not granted. I have listed all the people we currently care for and how we will all be harmed below.

**AM**

AM has received attendant care services from SFH since 2011. In 2015, AM's mother chose the Community Living Supports service option for AM and assigned his attendant care hours to the SFH agency and to PASS, a day program she approved for AM. AM rented and lived in a mother-in law suite in my home until he moved to Estacada in 2021 to live with Sam, his most experienced staff, who has cared for AM for over ten years.

AM is mentally about the level of a one-year-old child, is 6'3" tall and weighs about 240 pounds. He has a seizure disorder and can experience seizures daily, weekly or monthly, including vomiting seizures. AM has autism, is nonverbal, and harms himself by biting his hands and pounding his head with his hands.

AM has no social awareness, so will masturbate freely in public, will take the food of strangers and will walk into traffic. He needs assistance with all activities of daily living, including eating, toileting, grooming, dressing, bathing, and transferring. He also needs assistance with instrumental activities of daily living, including (but not limited to) meal planning and prepara-

tion, managing finances, shopping for food, clothing, and other essential items, performing essential household chores, communicating by phone or other media, and participating in the community. His individual support plan (ISP) requires him to be provided with one attendant care staff for all hours and a second staff for other community activities such as going grocery shopping. SFH currently employs five caregivers for AM, including Sam.

AM currently lives in Estacada with Sam, his most experienced caregiver. His rent is paid monthly by his representative payee. AM has no alternate housing options immediately available to him that he can afford.

Each new caregiver receives training from Sam for AM's care.  Sam's close proximity to AM allows SFH to have an emergency back-up staff generally available when caregivers call out or when snow or other environmental issues make transportation to AM's home impossible. This is an incredibly important feature that will be lost if the preliminary injunction is not granted.

Sam is willing to work for SFH and have AM rent space in his home, but Sam is not willing to become a foster care provider or have his home licensed as a foster care home. The new rules do not allow SFH to employ Sam to care for AM even if Sam agreed to move out of his home because the new rules define Sam as a "provider" and the new rules prohibit a provider from providing care in a home the provider owns.

In order to comply with the new rule, SFH must fire Sam and replace him with other staff. Firing Sam would irreparably harm SFH because SFH could not replace Sam's level of knowledge and experience with AM. SFH, like all agencies, finds it difficult to hire caregivers and the turnover is high. Even if SFH could fill Sam's shifts, which it cannot, SFH does not have another caregiver in the Estacada area with enough experience to train new staff on the complexities of AM's care. AM is extremely vulnerable to neglect and abuse and new, unskilled caregivers, without any ill intent, could easily neglect AM.

**DECLARATION OF JOAN SCHRADER**
Page 4 of 9

**TH**

TH has received attendant care services from SFH since 2013. TH divided his hours of attendant care between SFH and Albertina Kerr (where he had a job separating clothes hangers) until he retired. After retirement, TH requested all attendant hours be provided by SFH. TH is 6'4", has an uncontrolled, rare, seizure disorder and he experiences more than six types of seizures that occur at random times during the day and night. One type of seizure causes outbursts of anger during which he verbally assaults and attempts to physically assault his attendant care staff. Because his movements are so slow, staff have generally avoided injury. TH also has a severe balance disorder, cerebral palsy and intellectual disabilities and a history of sexual assault although charges were not pressed. TH needs assistance with all activities of daily living, including eating, toileting, grooming, dressing, bathing, and transferring. He also needs assistance with instrumental activities of daily living, including (but not limited to) meal planning and preparation, managing finances, shopping for food, clothing, and other essential items, performing essential household chores, communicating by phone or other media, and participating in the community.

TH lives in a studio apartment attached to my home. TH has a rental agreement that secures his right to live in his apartment and his rent is paid monthly by his representative payee.

TH has a team of seven SFH caregivers that provide the 1:1 and 2:1 care TH needs according to his Individual Support Plan.  I do not work any scheduled shifts with TH, but in an emergency, of course, I would assist with TH's care. TH is free to assign some or all of his attendant care hours to the provider(s) of his choice.

The new rules do not allow TH to live in his rental home and receive care from his current SFH caregivers because TH's apartment is attached to my home. Although I do not work caregiving shifts with TH, I am considered a provider because my company, SFH, provides care to TH. Based on the new rules, TH must move out of the apartment he has lived in for years to

**DECLARATION OF JOAN SCHRADER**

continue to receive attendant care from his experienced SFH staff. Alternatively, the new rules

require TH to receive hourly attendant care from any other provider other than SFH.

If TH stays in his home, TH would lose his SFH caregivers, several of whom have cared

for TH for years. TH's loss of all of his experienced caregivers would put his health and safety at

risk because his care is complex, and he is not safe to be exposed to only inexperienced

caregivers. For example, when TH was recovering from hip surgery at a skilled nursing facility,

he suffered physical injuries because his inexperienced staff left him in a wheelchair unattended.

While sitting unattended, a seizure threw him onto the floor where his convulsions caused his

head and limbs to violently smack against the wall and floor. He was found lying on the floor

bleeding from his head and limbs.

TH has no alternate housing options immediately available to him that he can afford. To

remain in his home and abide by the new rules, TH must fire his SFH caregivers and hire other

caregivers who have no experience caring for him, putting his health and safety at risk.


**WR**

WR is 6'3" tall and weighs about 300 pounds, has autism, is non-verbal and is unable to

functionally communicate. He has PICA, a disorder that causes a person to seek out and eat ined-

ible objects and he has food seeking behaviors as well. He has broken a caregiver's wrist, has

knocked the jaw of a caregiver out of joint and is at risk of hurting himself and his caregivers.

Because of his behaviors, he is unable to have his teeth cleaned or have other routine medical

procedures performed without full sedation in a hospital.

WR has no social awareness, so will masturbate freely in public, will take the food of

strangers and will walk into traffic. He needs assistance with all activities of daily living, includ-

ing eating, toileting, grooming, dressing, bathing, and transferring. He also needs assistance with

instrumental activities of daily living, including (but not limited to) meal planning and prepara-

tion, managing finances, shopping for food, clothing, and other essential items, performing es-

sential household chores, communicating by phone or other media, and participating in the com-

munity.

WR's individual support plan (ISP) requires one attendant care staff for all hours and a

second staff available for all waking hours---sixteen hours per day. WR's guardian currently di-

vides WR's attendant care hours between WR's day program, PASS, SFH, and WR's mother, an

independent provider who does not work for SFH.

SFH currently employs five caregivers for WR, including Meserak. WR currently lives in

Clackamas with Meserak, his most experienced caregiver. His rent is paid monthly by his repre-

sentative payee. Each new caregiver receives training from Meserak for WR's care.  Meserak's

close proximity to WR allows SFH to have an emergency back-up staff generally available when

caregivers call out or when snow or other environmental issues make transportation to WR's

home impossible. This is an incredibly important feature that will be lost if the preliminary in-

junction is not granted. Meserak is willing to work for SFH and have WR rent space in her home,

but Meserak is not willing to become a foster care provider or have her home licensed as a foster

care home. The new rules do not allow SFH to employ Meserak if WR lives with her.

In order to comply with the new rule, SFH must fire Meserak and replace her with other

staff. Firing Meserak would irreparably harm SFH because SFH could not replace Meserak's

level of knowledge and experience with WR. SFH, like all agencies, finds it difficult to hire care-

givers and the turnover is high. Currently, WR's staff are consistently working overtime because

SFH has been unable to hire and fill shifts for WR. Even if SFH could fill Meserak's shifts,

which it cannot, SFH does not have another caregiver with enough experience to train new staff

**DECLARATION OF JOAN SCHRADER**

on the complexities of WR's care. WR is extremely vulnerable to neglect and abuse. New, un-skilled caregivers, without any ill intent, could easily neglect WR and WR could physically harm inexperienced caregivers.

Alternatively, WR could find housing outside of Meserak's home, however, WR has no alternate housing options immediately available to him that he can afford.


**CW and CM**

SFH also serves CW and CM, two women with similar disabilities as AM, TH, and WR, who have lived together for over fifteen years. Their rent is paid monthly by their respective representative payees and CW and CM have no alternate housing options immediately available to them that they can afford.

The new rules put them in a similar position as AM, TH and WR because they rent a home that is owned by an SFH employee who generally performs training and administrative functions for SFH but who has been willing to fill in caregiving shifts because SFH is short-staffed. Unlike AM, TH and WR, SFH would be able to exchange the caregiving shifts this employee works with CW and CM to other SFH clients. However, this does not change SFH's position because the rule forbids CW and CM from living in a home that is owned by any employee of SFH, not just by one of their caregivers. Consequently, to keep CW and CM as clients, SFH must fire this valuable employee altogether from SFH's employ to abide by the rule. With the exception of when he got Covid, this employee has not missed a day of work, has never been late, and has performed his work in an exemplary manner---a valuable employee for SFH. SFH is already unable to fill all caregiving shifts and it has taken me over a year to train this employee to perform the administrative tasks for which he was hired. SFH has no one with this employee's experience to immediately take his position.


**DECLARATION OF JOAN SCHRADER**
Page 8 of 9

The Office of Developmental Disabilities services is responsible to deliver the attendant care these individuals are entitled to receive either by contracting with agencies such as SFH or by providing other attendant caregivers. However, the Office of Developmental Disabilities has made no alternative plans for the care of AM, TH, WR, CM or CW even though the new rule is now in effect.

If SFH were to serve any of the individuals it cares for a 30-day exit notice to exit out of SFH's services altogether, it would leave SFH's clients scrambling to find either a new home, or new caregivers with enough experience to provide the care they need. The new rule is in effect, and as it stands, SFH is subject to criminal prosecution for the care it provides in the homes of these individuals. SFH must close (or exit all of the individuals it cares for) to save itself from the threat of criminal prosecution. SFH would cease to exist.

Personally, my livelihood would be extinguished. The anguish I would experience would be unbearable. The commitment I make for the individuals SFH serves is for SFH to serve them their entire lives if they and their families so choose. They are each very dear to me and losing them out of my daily work life, especially the ones that have been in SFH care for many years, would cause me to suffer irreparably. Because of their high, complex needs, I fear for their safety and well-being, a fear that does not diminish over time because it is based on their inability to communicate their needs.

I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.

Dated: 1-10-2023

Joan Schrader, Plaintiff

**DECLARATION OF JOAN SCHRADER**
Page 9 of 9