IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JOAN SCHRADER and SPECIALTY
FAMILY HOMES, LLC,

               Plaintiffs,

    v.

FARIBORZ PAKSERESHT, in his
official and individual capacity,

               Defendant.

Case No. 3:22-cv-01957-JR

OPINION AND ORDER

RUSSO, Magistrate Judge:

       Plaintiffs Joan Schrader and Specialty Family Homes, LLC ("SFH") move to enjoin

defendant Fariborz Pakseresht from implementing and enforcing Or. Admin. R. 411-450-060(6).

All parties have consented to allow a Magistrate Judge enter final orders and judgment in this case

in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). For the reasons set forth below,

plaintiffs' motion is denied.

Page 1 – OPINION AND ORDER

## BACKGROUND

Schrader is the sole owner of SFH, a company that provides services to adults with developmental disabilities. SFH is under contract with the Oregon Department of Human Services Office of Developmental Disabilities ("ODHS") to furnish such services and receive payment in relation to Medicaid-eligible individuals in both Oregon home and community-based settings. Payments are typically made by ODHS using federal and state funds.

Plaintiffs filed this action on December 20, 2022, alleging that a new rule adopted by ODHS, of which Pakseresht is the Director, discriminates on the basis of disability in violation of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and the Fair Housing Act ("FHA"):

> In 2022, Defendant State of Oregon proposed new administrative rules that will have a major impact on where disabled individuals are allowed to live. Currently, Plaintiffs provide community living support to disabled individuals who all currently reside with their caregivers/providers. However, the new proposed rules would make this type of living arrangement unlawful.
>
> Specifically, Oregon's Office of Developmental Disabilities Services (part of Oregon's Department of Human Services) has proposed the following addition to OAR 411-450-0060(6): "(6) SETTING LIMITATIONS. (a) An individual may receive community living supports if the individual: (A) Resides in a setting the individual owns, leases, or rents or is on the property deed, mortgage, or title. (B) Resides in a setting, either through an informal arrangement or rental agreement, owned, leased, or rented by a family member. (C) Has no permanent residence. (b) An individual is not eligible for community living supports, other than DSA, if the individual resides in one of the following: (A) A provider-owned dwelling or a provider-rented dwelling through an informal or formal agreement. (B) A provider owned, controlled, or operated setting."
>
> These rules are set to take effect on 12/27/2022 and will destroy Plaintiffs' business operations. Plaintiffs will no longer be able to provide community living supports to any of SFH's clients (who are all disabled) if these rules are allowed to go into effect. Alternatively, it would force SFH clients into homelessness in order to continue to receive the attendant care they need from SFH. Each of these individuals require the care of 5 or 6 highley [sic] trained attendant providers. Replacing these providers on such short notice would be impossible. Plaintiffs have

sought a variance exception for this rule, but have not gotten a response as of the filing of this complaint.

Compl. ¶¶ 6-8 (doc. 1).

In particular, plaintiffs assert the following claims: (1) discrimination against disabled individuals due to the severity of their disabilities under 42 U.S.C. § 12132 and 29 U.S.C. § 794(a); (2) discrimination for failure to provide reasonable accommodations in the form of allowing disabled individuals to receive community living support care and reside with their caregivers under 42 U.S.C. § 12132 and § 3604(f)(3)(B); and (3) retaliation for opposing the proposed rule changes under 42 U.S.C. § 12203.

On January 11, 2023, plaintiffs filed the present motion for a preliminary injunction. After initial briefing, a hearing was set with U.S. Magistrate Judge Beckerman for February 3, 2023. At that hearing, Judge Beckerman set a deadline for the filing of a reply brief and informed the parties that "this case will be transferred to Magistrate Judge Jolie A. Russo because it is related to *Schrader et al v. Pakseresht et al*, case No. 3:22-cv-00945-JR." Order (doc. 22). On February 6, 2023, the case was reassigned to this Court. Briefing was completed and a hearing was held on March 22, 2023.

## STANDARD

A preliminary injunction, as a matter of equitable discretion, is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief. *Winter v. Natural Res. Def. Council Inc.,* 555 U.S. 7, 24 (2008). The party seeking a preliminary injunction must demonstrate: "(1) likely success on the merits; (2) likely irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in [its] favor; and (4) that an injunction is in the public interest." *Pimentel v. Dreyfus,* 670 F.3d 1096, 1105 (9th Cir. 2012) (citing *Winter,* 555 U.S. at 20). The final two factors of the *Winter* test "merge when the Government is the opposing

party" and should be considered together. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "The elements of [this] test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

## DISCUSSION

This dispute centers on whether ODHS' amended rule represents "a clear violation of Federal law." Pls.' Mot. Prelim. Inj. 3-4 (doc. 4). Plaintiffs contend that, if defendant's actions are not enjoined, "disabled individuals [will be barred] from choosing where they live and who they live with, whereas non-disabled individuals have no such restrictions," and plaintiffs' "entire business model and sole source of income will be destroyed." *Id.* at 4, 6. Plaintiffs also broadly conclude that each of the *Winter* factors favor the issuance of a preliminary injunction.

In response, defendant clarifies that "[t]he rules do not prevent any person with a disability from obtaining attendant care services funded by ODHS [or] plaintiffs from providing attendant care services . . . What the new rule did was clarify that the prohibition against paying for unlicensed services included situations where the disabled adult lives with a caregiver who is an employee of the company that provides services to the adult." Def.'s Resp. to Mot. Prelim. Inj. 1 (doc. 18). Additionally, defendant argues plaintiffs' claims fail on the merits, due in part to a lack of standing, and that irreparable harm is lacking because the only loss at issue is financial. Defendant asserts that the remaining factors do not favor plaintiffs.

## I.    Legal Background Surrounding the Rule Change

Under Oregon law, adults whose developmental disability results in lasting and significant impairment in one or more areas of major life activity are entitled to receive developmental disability support services. Or. Rev. Stat. §§ 427.007(4), 427.121(1); Or. Admin. R. 411-320-0080.

Support services are provided according to an individual support plan ("ISP") that identifies the "resources, services and purchases necessary for an individual with a developmental disability to achieve identified personal goals and maximize self-determination." Or. Rev. Stat. §§ 427.101(5), 427.154. Adults have the right to participate in the development and revision of their ISPs and to have services provided in a manner that is least restrictive to the adult's liberty. Or. Rev. Stat. § 427.107(2).

ODHS makes available services to assist adults with developmental disabilities with activities of daily living and instrumental activities of daily living. Activities of daily living include basic personal everyday activities, such as eating, toileting, grooming, dressing, bathing, and transferring. Or. Admin. R. 411-317-0000(7)-(8), 411-450-0060(2)(a). Instrumental activities of daily living include housekeeping tasks necessary to ensure health and safety, laundry, meal preparation, and grocery shopping. Or. Admin. R. 411-317-0000(107), 411-450-0060(2)(b). This combination of assistance with activities of daily living, instrumental activities of daily living, and health-related tasks is often referred to as "attendant care." Or. Admin. R. 411-317-0000(18).

To obtain attendant care, eligible adults must have a functional assessment of their needs and an ISP signed by the adult or their representative, case manager, and community provider. Or. Admin. R. 411-415-0070(1)(e), (2), 411-004-0030(2). That functional assessment and the adult's residential setting determine the adult's "service level" – i.e., the maximum amount of assistance, generally measured by the number of attendant care hours for which the adult is eligible. Or. Admin. R. 411-450-0020(29).

Adults with developmental disabilities live and receive services in a variety of settings. Residential settings – in which the eligible adult both lives and receives care – must be licensed by the State of Oregon, except where the provider is a family member. Or. Rev. Stat. §§ 443.410,

443.705, 443.725(1). Residential care thus is often described as a "provider-owned or controlled" setting.

Conversely, in home-based settings, the eligible adult owns the home, arranges to rent a home or a space within a home, or lives with a family member, and then obtains the necessary support services in their home through independent care providers. To obtain those services, adults can employ caregivers directly, in which case the caregivers are called "personal support workers." Or. Admin. R. 411-375-0010(31). Alternatively, adults can hire a company, otherwise known as a "provider agency" (such as SFH), to hire the caregivers necessary to furnish care. Services provided by provider agencies are considered "community living supports" and are governed by Oregon Administrative Rule Chapter 411, Division 450. In contrast with adult foster homes and other "provider-owned or controlled" settings, a provider of "community living supports" does not need a residential care license. Instead, a provider of community living supports must be certified and endorsed pursuant to rules found in Oregon Administrative Rule Chapter 411, Division 323. Or. Admin. R. 411-450-0070(2).

Attendant care services, whether delivered in a residential setting or in an adult's home by a community living supports provider, are paid for by the State and by Medicaid. The "Community First Choice" option permits a state to provide, through an amendment to its Medicaid plan, "home and community-based services" and supports to eligible individuals with intellectual and developmental disabilities. 42 U.S.C. § 1396n(k). Specifically, individuals are eligible for home and community based services ("HCBS") if, but for the provision of those services, the individuals would require an "institutional" level of care, such as in a hospital, nursing facility, or institution for mental diseases. *Id.* A participating state that provides HCBS under an approved plan in compliance with the Medicaid law receives an increased level of federal reimbursement. *Id.*

Oregon has elected to participate in Community First Choice and has a state plan amendment approved by the Centers for Medicaid and Medicare Services ("CMS"). CMS has issued regulations implementing Community First Choice, which are found at 42 C.F.R. § 441.500, et seq. Those regulations describe, among other things, requirements of individual eligibility and for the state plan and provision of services. They also impose additional requirements that apply specifically to "provider-owned or controlled residential settings." Oregon has implemented these federal requirements by adopting Oregon Administrative Rule Chapter 411, Division 004. Those rules define a "provider owned, controlled, or operated residential setting" as one in which:

> (a) The residential provider is responsible for delivering HCBS to individuals in the setting and the provider:
> (A) Owns the setting;
> (B) Leases or co-leases the residential setting; or
> (C) If the provider has a direct or indirect financial relationship with the property owner, the setting is presumed to be provider controlled or operated.
>
> (b) A setting is not provider-owned, controlled, or operated if the individual leases directly from a third party that has no direct or indirect financial relationship with the provider.
>
> (c) When an individual receives services in the home of a family member, the home is not considered provider-owned, controlled, or operated.

Or. Admin. R. 411-004-0010(17).

## II.    Factual Background Surrounding the Rule Change

SFH provides services to five adults with developmental disabilities – i.e., AM, TH, WR, CW, and CM. Schrader Decl. pg. 3 (doc. 5).[1] In particular, AM rents space in the home of an SFH employee – i.e., Sam Schrader – and obtains his attendant care services from SFH through Sam

---

[1] In addition to Schrader's own declaration, plaintiffs submit declarations from AM and WR's legal guardians in support of their motion. *See generally* Moen Decl. (doc. 29); Rushold Decl. (doc. 30). These declarations describe the challenges AM and WR would face living in a foster home and/or transitioning out of their current living situations.

and several other caregivers. *Id.* at pgs. 3-4. Sam is willing to work for SFH while AM lives with him, "but Sam is not willing to become a foster care provider or have his home licensed as a foster care home." *Id.* at pg. 4. WR's circumstances are substantially similar to AM's, although he lives with a different SFH employee. *Id.* at pgs. 6-8.

SFH provides care to two other adults, CR and CM, who live with a third SFH employee. *Id.* at pg. 8. That employee generally performs training and administrative functions for SFH but does fill in for caregiving shifts when SFH is short-staffed. *Id.*

Finally, TH lives in a studio apartment attached to Schrader's home. *Id.* at pg. 5. TH obtains his attendant care from a team of seven SFH caregivers. *Id.* Although Schrader does not work regularly scheduled shifts providing direct care to TH, she may assist in an emergency. *Id.*

On October 15, 2022, the Office of Developmental Disabilities Services, a subdivision of ODHS, proposed amendments to Oregon Administrative Rule Chapter 411, Divisions 323 and 450. Davis Decl. ¶ 4 (doc. 20). Included in those amendments were changes to Or. Admin. R. 411-450-0060(6), which further describes the settings in which an individual may receive community living supports. That rule became effective on December 20, 2022. Davis Decl. Ex. 5 (doc. 20)

On December 15, 2022, Schrader sent an email to ODHS requesting a variance from Or. Admin. R. 411-450-0060(6), presenting several new facts about her business, including that "some of SFH's employees had donated their homes to the nonprofit entity Slipstream Dream [which was established by Schrader], which then rented those homes back to their former owners rent free and also rented them to SFH clients." Shockley Decl. ¶ 2 & Ex. 1 (doc. 19). On December 20, 2022, Schrader submitted a second variance request. Shockley Decl. Ex. 2 (doc. 19). That same day, before ODHS responded to either request, plaintiffs filed this action. On January 24, 2023, counsel for ODHS emailed plaintiffs' counsel, requesting specific additional information to support

Schrader's variance requests. Shockley Decl. ¶ 4 (doc. 19); Davis Decl. Ex. 3 (doc. 20). As of the filing of defendant's opposition, counsel for ODHS had not received a response from plaintiffs' counsel, nor had ODHS received a response directly from Schrader.[2] Davis Decl. ¶ 1 (doc. 20).

**III.    Preliminary Injunction Analysis**

**A.    Likelihood of Success on the Merits**

Plaintiffs argue that they are likely to succeed on the merits of their claims because various federal statutes and regulations allow developmentally disabled adults to choose "where they live and who they live with" and obtain services "in the most integrated setting appropriate to the individual's need," including community-based services. Pls.' Mot. Prelim. Inj. 4-6 (doc. 4) (citation and internal quotations omitted).

In contrast, defendant contends that plaintiffs cannot prevail since the "relevant rules do not discriminate on the basis of disability; they do not exclude either plaintiffs or any disabled person from receiving any public benefit . . . [they] provide only that [ODHS] will not provide community living supports in settings that are functionally residential settings, where a license is required." Def.'s Resp. to Mot. Prelim. Inj. 9 (doc. 18). Defendant maintains that plaintiffs "are free to provide community living supports in eligible settings without a license, and adults are free to receive community living supports from plaintiffs in eligible settings." *Id.*

To state a claim under Title II of the ADA or Section 504 of the Rehabilitation Act, a plaintiff must allege facts establishing, among other elements, that he or she is a qualified individual with a disability, and was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities by reason of disability. *Weinreich v. L.A. Cnty.*

---

[2] At oral argument, defendant explained that Schrader reached out to a different regulatory body on February 9, 2023, and indicated her variance request was futile; there have been no further communications since that time. Hearing (Mar. 22, 2023) (doc. 36).

*Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997). Likewise, an FHA claim in this context requires the plaintiff to show, among other things, that an accommodation of an individual's disability is necessary to afford that person equal opportunity to use and enjoy a dwelling. *Dubois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2006).

Critically, SFH is an entity and Schrader has not indicated that she is an individual with a disability, or that she has been denied benefits or accommodations because of her disability. Rather, both the complaint and record evince that plaintiffs provide care to disabled adults but are not themselves disabled.[3] For this reason, alone, plaintiffs' claims unrelated to retaliation are unlikely to succeed on the merits.

Even assuming plaintiffs have standing to pursue claims on behalf of their clients, the rule change does not discriminate based on disability or exclude eligible individuals from any public benefit. For example, SFH's client TH can continue living with Schrader if SFH either obtains the appropriate license or is no longer his care provider. Alternatively, TH can continue receiving

---

[3] To the extent plaintiffs rely on "associational standing," their motion is misplaced. As a preliminary matter, plaintiffs' argument surrounding this issue lacks any factual or legal analysis and is other otherwise non-responsive. *See, e.g.*, Pls.' Reply to Mot. Prelim. Inj. 2-3 (doc. 28); Hearing (Mar. 22, 2023) (doc. 36); *see also Justice v. Rockwell Collins, Inc.*, 117 F.Supp.3d 1119, 1134 (D. Or. 2015), *aff'd*, 720 Fed.Appx. 365 (9th Cir. 2017) ("if a party fails to counter an argument that the opposing party makes . . . the court may treat that argument as conceded") (citation and internal quotations and brackets omitted). Regardless, "[t]he Ninth Circuit has not yet addressed associational discriminations claim under Title II of the ADA but district courts throughout the circuit appear to be in consensus that a plaintiff may bring an associational discrimination claim but only if the plaintiff has suffered an injury independent of the injury suffered by his or her disabled associate." *Kim v. Beaverton Sch. Dist. 48J*, 2021 WL 2188238, *7 (D. Or. May 28, 2021) (collecting cases). As addressed herein, plaintiffs have not adequately demonstrated that their disabled clients have experienced discrimination as a result of the challenged rule change. And plaintiffs' injury – which is financial in nature – does not typically fall within the purview of the Rehabilitation Act, FHA, or ADA. *See id.* at *8 ("[a]n individual who is denied access to a public entity's services because the individual is associated with a disabled person [or] harmed because of an entity's discrimination against his or her disabled associate" has suffered an independent injury).

services from SFH without SFH needing a license if he moves out of Schrader's home. As defendant observes, "TH is not limited in his choice of caregiver or his choice of residence, other that the obvious limitation that TH may not choose, nor may SFH provide, unlicensed residential care. That mild limitation does not constitute disability-based discrimination." Def.'s Resp. to Mot. Prelim. Inj. 13 (doc. 18) (citing *Howard v. HMK Holdings, LLC*, 988 F.3d 1185, 1191 (9th Cir. 2021), "for the principle that 'not every rule that creates a general inconvenience or expense to the disabled needs to be modified'"). The same is true of SFH's other clients, although some may have additional options. *See id.* at 14 (denoting that "AM could maintain his continuity of care with Sam by hiring Sam directly as an independent personal support worker").

Plaintiffs' reasonable accommodations claims are unlikely to succeed for an additional reason. Significantly, plaintiffs initiated this lawsuit one week after her first variance request and two days after her second variance request. In other words, ODHS did not have a reasonable opportunity to respond, especially considering that plaintiffs' first variance request contained new information, including that several SFH employees had "donated" their homes to Slipstream Dream and that SFH does not deduct income taxes from those employees' paychecks. Shockley Decl. ¶ 2 & Ex. 1 (doc. 19). Further, on January 24, 2023, ODHS asked plaintiffs for additional information to support their variance requests and stated it would "delay enforcement of the rules to allow submission of these documents so it can properly evaluate the requests before taking corrective action." Davis Decl. Ex. 3, at 2 (doc. 20). Plaintiffs have not yet responded. Davis Decl. ¶ 3 (doc. 20); Hearing (Mar. 22, 2023) (doc. 36).

The Court therefore cannot infer that ODHS has unreasonably refused to permit an accommodation. The parties are at the beginning of the interactive process and ODHS has indicated its willingness to delay enforcement to allow evaluation of the variance requests. Given

these circumstances, no liability can attach. *See Summers v. City of Fitchburg*, 940 F.3d 133, 141 (1st Cir. 2019) (granting summary judgment in favor of the governmental defendants in regard to an FHA reasonable accommodation claim where they allowed the plaintiffs a six-month grace period to come into compliance with the underlying zoning ordinance and the plaintiffs ultimately withdrew from the interactive process); *see also Howard*, 988 F.3d at 1194 (although "the ADA makes the interactive process necessary in the employment context, the statutory language does not require the interactive process in the context of public accommodations and services").

Finally, concerning plaintiffs' retaliation claim, the Complaint is bereft of any well-plead supporting factual allegations. That is, the only related allegation – i.e., that, "[u]pon information and belief," ODHS's adoption of the rule "was motivated in whole or in part by the desire to shut down Plaintiffs' business" – is conclusory and devoid of factual support. Compl. ¶ 11 (doc. 1); *see also* Hearing (Mar. 22, 2023) (doc. 36) (acknowledging that plaintiffs' retaliation claim was not properly before the Court as plead). And plaintiffs' motion and supporting declaration do not contain any facts relevant to retaliation. Accordingly, the first *Winter* factor does not weigh in favor of plaintiffs.[4]

---

[4] In their motion, plaintiffs argue 42 U.S.C. § 1396n(k)(6) requires states to give adults "maximum control of the home and community-based attendant services and supports, regardless of who acts as the employer of record," and that Or. Admin. R. 411-450-0060(6) diminishes adults' control of their services in violation of the statute. *See, e.g.*, Pls.' Mot. Prelim. Inj. 5-6 (doc. 4). Although plaintiffs maintain they "are not claiming they have a private right of action under federal Medicaid statutes," they otherwise assert they "have properly pled violations of the Medicaid statutes and this claim has merit." Pls.' Reply to Mot. Prelim. Inj. 3 (doc. 28). However, the dispositive pleading does not allege a claim under 42 U.S.C. § 1396n(k)(6) or otherwise reference this theory of recovery, which is fatal in this context. *See Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015) ("[w]hen a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction."). In any event, as defendant denoted at the hearing, "maximum control" does not equate with "unlimited control" – plaintiffs' clients are required to choose only from eligible service options. Hearing (Mar. 22, 2023) (doc. 36). Furthermore, plaintiffs previously unsuccessfully asserted a virtually identical claim in state court. In that case, plaintiffs sought judicial review of an ODHS order stating that

B.    **Likelihood of Irreparable Harm**

Plaintiffs contend that they will be irreparably harmed by the implementation of Or. Admin. R. 411-450-0060(6) because their "entire business model and sole source of income will be destroyed" and "disabled individuals under the care of [SFH would be forced] to either vacate their homes or . . . their current caregivers [will be forced] to quit providing care, leaving the disabled individuals to find highly qualified caregivers on extremely short notice." Pls.' Mot. Prelim. Inj. 6 (doc. 4).

Defendant counters that plaintiffs' "potential loss of employees [or business] is neither imminent nor irreparable" and they "are unlikely to suffer any harm by way of enforcement proceedings for some time, and even then, such harm would merely be enforcement proceedings that would not impose corrective action until after notice and opportunity for a hearing." Def.'s Resp. to Mot. Prelim. Inj. 20-23 (doc. 18).

---

ODHS would no longer pay for community living supports SFH was providing to a client living in Schrader's home on the grounds that SFH was providing residential care without a license. Davis Decl. Ex. 6, at 14 (doc. 20). Among other claims, plaintiffs asserted that the ODHS order violated Medicaid law by unlawfully limiting an adult's choice of residence and care provider. *Id.* at 26-35, 46-49. After lengthy briefing and argument, the Marion County Circuit Court held that the Medicaid statutes and regulations did not prohibit ODHS "from requiring a license to provide care in a provider-owned or controlled residential setting. DHS's licensing requirement does not violate a developmentally disabled client's freedom to choose her provider or providers of services." Davis Decl. Ex. 8, at 2 (doc. 20). The Marion County Circuit Court held further that: "i. [plaintiffs] lack standing to assert AM's rights under Medicaid. Alternatively, if [plaintiffs] have standing to assert AM's rights under Medicaid, the Court finds that, as a matter of law, AM does not have a right under Medicaid statutes or regulations to live in a setting owned or controlled by [plaintiffs] free of generally applicable licensing requirements imposed by Oregon law. ii. As to [plaintiffs'] rights, the Court finds that, as a matter of law, [plaintiffs] do not have a right under Medicaid statutes or regulations to provide AM's care in a setting owned or controlled by [plaintiffs] free of generally applicable licensing requirements imposed by Oregon law." *Id.* at 3. Thus, even if plaintiffs had properly asserted a claim under 42 U.S.C. § 1396n(k)(6), they are unlikely to succeed on the merits. *See, e.g.*, Davis Decl. Ex. 7 (doc. 20).

The Court finds that the likelihood of irreparable harm in the absence of preliminary relief is slight. Initially, because provider-controlled settings were already settings in which adults were not eligible to receive community living supports, the amendments to Or. Admin. R. 411-450-0060(6) did not significantly alter the legal landscape. For example, the earlier version of Or. Admin. R. 411-450-0060(6)(b)(B) provided that an adult enrolled in a residential program or adult foster home is not eligible to receive community living supports provided by a personal support worker or in their home, "whether the home is a licensed setting or not." Davis Decl. Ex. 4, at 6 (doc. 20). Similarly, Or. Admin. R. 411-450-0070 already specified that an adult foster home provider may not furnish community living supports to an individual in or based out of the home of the individual. And, as denoted in Section I, Or. Admin. R. 411-004-0010(17), which defines provider-controlled settings and was last amended in 2017, focuses on financial independence between the person furnishing the adult's care and the person providing the adult's housing.

Thus, contrary to plaintiffs' assertion, there is no indication that "[t]his was not an issue until the creation of the new rule that is the subject of this complaint, which seems to be targeted only at Mrs. Schrader and SFH." Pls.' Reply to Mot. Prelim. Inj. 2 (doc. 28). Indeed, prior to the challenged rule change, ODHS had informed plaintiffs that community living supports could not be provided to a client living in Schrader's home on the grounds that SFH was providing residential care without a license. Davis Decl. Ex. 6, at 14 (doc. 20).

Plaintiffs are unlikely to suffer irreparable injury for three additional reasons. First, as addressed in Section III(A), the rule change does not implicitly necessitate the termination of SFH's employees residing with clients; plaintiffs have other options to obtain compliance. Second, a business's loss of employees supports a finding of irreparable harm only in narrow circumstances, which do not appear to be present here. *See OAO Corp. v. United State*s, 49 Fed.

Cl. 478, 480 (2001) (harms resulting from "loss of employees . . . are primarily monetary. While these losses may be substantial, they are not irreparable.").[5]

While plaintiffs have established longstanding care relationships between AM and WR and the SFH employees with whom they reside, Schrader's evidence makes clear that a number of other individuals are trained and available to provide community living supports. *See, e.g.*, Schrader Decl. pgs. 3-8 (doc. 5); *see also* Def.'s Resp. to Mot. Prelim. Inj. 22 (doc. 18) ("[w]ell-trained caregivers are important to many vulnerable Oregonians and to the firms that employ them, and their services may be difficult or costly to replace. But costly is not the same as irreparable, and difficult to replace is not the same as impossible to replace. Many employers experience difficulty with turnover and with finding quality workers").

Third, plaintiffs are not facing imminent enforcement proceedings, and defendant has represented that it does not intend on displacing plaintiffs' clients and instead will engage in "'choice counseling,' a process in which ODHS, through its relevant local case management entities, meets with the affected adults and their guardians and representatives to discuss their

---

[5] Plaintiffs cite to two cases in support of the proposition that the loss of employees with unique skills can constitute irreparable injury – i.e., *A Place for Mom v. Perkins*, 475 F.Supp.3d 1217 (W.D. Wash. 2020), and *Dominion Video v. Echostar Satellite Corp.*, 356 F.3d 1256 (10th Cir. 2004). Pls.' Reply to Mot. Prelim. Inj. 6 (doc. 28). *Dominion* emanated from the breach of an exclusivity clause – wherein the court noted that, "under Indiana law, when employee uses experience gained from employer in violation of covenant not-to-compete, irreparable injury occurs" – and ultimately concluded that irreparable harm was lacking. 356 F.3d at 1263. Similarly, *Perkins* concerned trade secret theft and a non-complete clause and determined, in that limited context, that "the potential to lose customers, employees, goodwill, and revenue" can support a finding of irreparable harm. *Perkins*, 475 F.supp.3d at 1231. In contrast, plaintiffs here are not pursuing contractual or intellectual property claims. And, as discussed at the hearing, plaintiffs have not put forth any evidence establishing their employees' services are unique or that the loss of those services is imminent. Hearing (Mar. 22, 2023) (doc. 36); *see also Providence Title Co. v. Truly Title, Inc.*, 547 F.Supp.3d 585, 612 (E.D. Tex. 2021) ("[t]he ability to obtain damages for lost employees has led other courts to conclude that, absent proof that a particular employee provided unique services, the loss of employees does not constitute an irreparable harm") (citation and internal quotations omitted).

Page 15 – OPINION AND ORDER

options and help them find suitable housing and service arrangements." Def.'s Resp. to Mot. Prelim. Inj. 24 (doc. 18). Specifically, defendant stated under penalty of perjury that "ODHS will implement the rule in a way that minimizes harm to SFH's clients, and will not require plaintiffs to stop providing services to their clients immediately or abruptly." *Id.*; Shockley Decl. ¶ 5 (doc. 19).

Concerning SFH's operations, "ODHS has informed plaintiffs that it is willing to delay enforcement of the rules to allow ODHS to gather information needed to evaluate the variance requests" and "does not anticipate enforcing the rule in a way that will work abrupt or unforeseen changes or harms upon plaintiffs." Def.'s Resp. to Mot. Prelim. Inj. 20 (doc. 18). Should plaintiffs fail to comply with OAR 411-450-0060(6), they will have an opportunity to raise any arguments attendant thereto:

> ODHS may enforce the rule by commencing proceedings to suspend, modify, or revoke plaintiffs' certification and endorsement to provide community living supports. Such a revocation proceeding will be a contested case proceeding under the Oregon Administrative Procedures Act [and] must begin with a notice of the proposed agency action, and the proposed action is not effective until after plaintiffs have had the opportunity for an evidentiary hearing and a written final order supported by findings of fact and law, among other procedural protections. That final order will be subject to judicial review in the Oregon Court of Appeals. In circumstances where there is a serious danger to the public health or safety, ODHS may impose a summary suspension, followed promptly by an opportunity for a hearing to challenge the suspension [which would] also [be] governed by the APA. In those enforcement proceedings, plaintiffs can make essentially the same arguments they make in this action.

*Id.* at 20-21 (internal citations omitted). Therefore, the second *Winter* factor also does not weigh in plaintiffs' favor.

## C.    Balance of Equities and Public Interest

The balance of equities and public interest do not tip strongly in either parties' favor. While plaintiffs assert that any harm to defendant is outweighed by the substantial injury they will suffer

if a preliminary injunction is not granted, because the injury at issue is primarily financial, maintenance of the status quo is not persuasive. More importantly, because defendant has not attempted to prevent plaintiffs from operating (and, as discussed in Section III(B), has no impending plans to do so), it is not clear that plaintiffs would suffer any hardship absent the requested relief. Stated differently, the implementation of Or. Admin. R. 411-450-0060(6) presents little risk of immediate hardship to plaintiffs or their clients.

Further, as defendant emphasizes, "[t]he legislature has decided that unlicensed residential care or adult foster care is contrary to the public interest." Def.'s Resp. to Mot. Prelim. Inj. 25 (doc. 18) (citing Or. Rev. Stat. §§ 443.410(1), 443.725(1)). As both parties acknowledge, adults who live in residential care settings are vulnerable to abuse and neglect. *Id.*; Schrader Decl. pg. 8 (doc. 5). And, as plaintiffs observe, the public has an interest "in making sure disabled individuals are treated fairly and equally" and "will continue to receive the same level of care." Pls.' Mot. Prelim. Inj. 7 (doc. 4); *see also id.* at 2 (noting that SFH has successfully employed the same caregiving model since 2015). It reasonably follows that, although changing a developmentally disabled individual's care or housing situation is not an insurmountable challenge, it would certainly cause disruption and temporarily negatively impact that individual's well-being.

**CONCLUSION**

Plaintiffs' Motion for Preliminary Injunction (doc. 4) is denied.

IT IS SO ORDERED.

DATED this 23rd day of March, 2023.

_____
/s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge
