ELLIOTT J. WILLIAMS, Bar No. 144835
elliott.williams@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: 503.224.3380
Facsimile: 503.220.2480
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

JOAN SCHRADER and SPECIALTY FAMILY HOMES, LLC,

Plaintiffs,

v.

FARIBORZ PAKSERESHT, in his individual capacity and official capacity as Director of Oregon Department of Human Services; OREGON DEPARTMENT OF HUMAN SERVICES; OFFICE OF DEVELOPMENTAL DISABILITIES SERVICES (ODDS)

Defendant.

Case No.: 3:22-cv-01957-JR

**FIRST AMENDED COMPLAINT**

DEMAND FOR JURY TRIAL

PLAINTIFFS Specialty Family Homes, LLC (hereafter, SFH) and Joan Schrader (Schrader), SFH's sole member, hereby allege as follows:

## I.    INTRODUCTION

1.

This case challenges a recently promulgated rule of the Office of Developmental Disabilities Services (ODDS) of Oregon's Department of Human Services (DHS). That Final Rule, as described and defined below, prohibits individuals with intellectual or developmental disabilities (I/DD) from receiving supportive living assistance from ODDS's community living supports program while living in a home of their choosing, if the home is owned, rented, controlled, or shared with a person, employee, or spouse of a person who provides care to the individual.

2.

The concept of this Final Rule was articulated four years ago, in 2019, when ODDS retaliated against Plaintiffs for advocating for a disabled individual who was hospitalized after ODDS failed to provide supportive nursing care that was required in the individual's service plan.

3.

The purported rationale for the Final Rule, preventing so-called "unlicensed foster care," mischaracterizes the context of the rule, which is *nonresidential settings* where the individual maintains the right to choose the individual's room, board, and support service provider.

4.

Instead of protecting the individual's choice, the Final Rule *removed* the individual's freedom to make those choices and acted *contrary* to ODDS's statutory mandate, including ORS 427.121, and contrary to the federal laws. Federal Due Process and the ADA's Integration Mandate require that ODDS respect the individual's rights of privacy, dignity, and respect, and

freedom from coercion and restraint, including rights of association, in choosing where and with whom to live. The Final Rule is arbitrary and capricious, discriminatory, retaliatory, and void.

## II.    PARTIES

5.

Plaintiff Schrader provides care to disabled individuals through her company, SFH. This care is provided by Plaintiffs in a community setting within the District of Oregon, and Plaintiffs are endorsed to provide Community Living Supports, hourly attendant care services, and 24-hour residential care programs.

6.

The State of Oregon accepts and administers federal Medicaid funding for disability programs through its DHS. The State of Oregon also accepts federal funds from programs administered under the Fair Housing Act. At all times material to this complaint, Defendant Fariborz Pakseresht (hereafter, Defendant Pakseresht) is an employee of Defendant State of Oregon, working as the director of Oregon's DHS. Defendant DHS is the state agency that promulgated the rule challenged by this action. Defendant ODDS is an office within the Oregon DHS that also was involved in promulgating the rule challenged by this action and in enforcing the rule against Plaintiff SFH.

## III.    JURISDICTION AND VENUE

7.

The events giving rise to this complaint occurred in this District. This Court has original jurisdiction of the federal claims contained in this complaint pursuant to 28 U.S.C. § 1331 and over the state law claims pursuant to 28 U.S.C. § 1367. Venue is proper in the United States

District Court, District of Oregon, Portland Division, because the events giving rise to Plaintiffs' claims took place within this District.

## IV. FACTUAL BACKGROUND

### A. Oregon's Programs for Individuals with Developmental Disabilities

8.

The Community First Choice Medicaid Program is a federal program authorized under 42 U.S.C. § 1396n(k) (known in Oregon as the "Oregon K Plan"). The "Community First Choice" (CFC) option went into effect October 2011 and was introduced in the Affordable Care Act to provide long-term services and supports to individuals in their homes or communities rather than in institutional settings. This program allows Oregon residents who are eligible for the state Medicaid plan and who also require an institutional level of care to receive assistance with daily living activities, as well as additional support such as community transportation, durable medical equipment, and home modifications. In exchange for participating in this program, the State of Oregon receives additional federal funds to help pay for the cost of the services provided.

The CFC benefit increases states' Federal Medical Assistance Percentage by six percentage points for covered home and community-based services and supports provided through the state plan to Medicaid enrollees who require an institutional level of care. Covered services include attendant services and supports intended to support enrollee input and control over the services they receive. Specifically, CFC covers:

- Assistance with activities of daily living (ADLs), instrumental activities of daily living (IADLs), and health-related tasks through hands-on assistance, supervision, and/or cuing;

- The acquisition, maintenance, and enhancement of skills necessary to accomplish ADLs, IADLs, and health-related tasks;

- Backup systems or mechanisms to ensure continuity of services and supports;

- Support system activities (such as needs assessment, assessment counseling, risk assessment and management, and person-centered service planning); and

- Voluntary training on selecting, managing, and dismissing attendants and ADLs.

9.

One of the conditions of receiving the adding federal funds made available through the CFC program is that the state provides services to disabled individuals "in the most integrated setting appropriate to the individual's needs, and without regard to the individual's age, type or nature of disability, severity of disability, or the form of home and community-based attendant services and supports that the individual requires in order to lead an independent life." 42 U.S.C. § 1396n(k)(3)(B).

10.

One of the requirements imposed on the States through Medicaid is that "[a] State plan for medical assistance must . . . (23) provide that (A) any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required (including an organization which provides such services, or arranges for their availability, on a prepayment basis), who undertakes to provide him such services." 42 U.S.C. § 1396a(a)(23). This provision—known as Medicaid's "free-choice-of-provider requirement"—protects the right of the individual to obtain assistance from any person qualified to provide such services. *See Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960, 963 (9th Cir. 2003).

11.

In the Rehabilitation Act of 1973, Congress stated, "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794 (1976). In the Americans with Disabilities Act, enacted in 1990, Congress required all public entities to refrain from discrimination, *see* 42 U.S.C. § 12132, and explicitly identified unjustified "segregation" of persons with disabilities as a "for[m] of discrimination," *id.* § 12101(a)(2) ("historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem"); *id.* § 12101(a)(5) ("individuals with disabilities continually encounter various forms of discrimination, including . . . segregation"); *see also* 28 C.F.R. § 35.130(d) ("A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.").

12.

Interpreting the above statutes in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), the Supreme Court affirmed a decision that the State of Georgia had discriminated against individuals with developmental disabilities in violation of federal law by declining to move them from an institutional setting to a community-based setting upon a showing that the individuals were qualified for a community-based setting. This "**Integration Mandate**" "serves one of the principal purposes of Title II of the ADA: ending the isolation and segregation of disabled persons." *Arc of Wash. State, Inc. v. Braddock*, 427 F.3d 615, 618 (9th Cir. 2005); *see also*

*Townsend v. Quasim*, 328 F.3d 511, 517 (9th Cir. 2003) (ruling that a state's failure to provide services to a qualified person in a community-based setting as opposed to a nursing home presents a violation of Title II of the ADA).

13.

42 C.F.R. § 441.530 requires states to make available attendant services and supports in a home and community-based setting to the same degree of access as individuals not receiving Medicaid home and community-based services.

14.

Enacting Oregon's program for I/DD individuals, the Oregon Legislature stated that the policy of the program is to promote the independence, integration, and productivity of individuals with I/DD needs.

> Individuals with intellectual and other developmental disabilities and society as a whole benefit when the individuals exercise choice and self-determination, living and working in the most integrated community settings appropriate to their needs, with supportive services that are designed and implemented consistent with the choice of the individuals regarding services, providers, goals and activities. Individuals with developmental disabilities, together with their families and advocates, must play a major role in the planning, designing, funding, operation and monitoring of community services. These services should be ultimately focused on the outcomes of independence, integration and productivity.

ORS 427.007(1)(a). Accordingly, an adult who has an intellectual or developmental disability and chooses to receive development disability services "has the right to choose the adult's community living setting" under Oregon law. ORS 427.121(2). Further, DHS or its designee is required "to present to an adult at least three types of community living settings, including an option for services in the adult's own or family home," at least as frequently as each year, and additionally, when an adult is moving from one community living setting to another community

living setting, unless the adult is moving from one nonresidential setting to another nonresidential setting, DHS or its designee is not required to present these options. ORS 427.121(2), (4). Similarly, ORS 430.610 states, "It is declared to be the policy and intent of the Legislative Assembly that: . . . (3) [t]o the greatest extent possible, mental health and developmental disabilities services shall be delivered in the community where the person lives in order to achieve maximum coordination of services and minimum disruption in the life of the person."

15.

Oregon's CFC program for I/DD individuals includes the following three types of settings:

> (a) A residential setting;
> (b) An individual's home or the home of the individual's family; or
> (c) Other nonresidential setting.

ORS 427.101(1). In residential settings, the provider is required to provide 24-hour supervision and care. The individual in a residential setting is restricted to receiving support services from a single provider. In a nonresidential setting (including the individual's own or family's home), the individual has choices to select room, board, and/or support services from whomever the individual chooses. For individuals who are living in a nonresidential setting, these choices are empowering and enhance self-determination, consistent with Oregon's policy (*see* ORS 427.007) and consistent with the federal Integration Mandate. Oregon's program for nonresidential settings that are in the individual's home or family's home or an "other nonresidential setting" under ORS 427.101(1)(b) and (c) is called Community Living Supports.

16.

Oregon's Community Living Supports program is set forth in a set of rules promulgated by DHS (OAR 411 Chapter 450) pursuant to its general rulemaking authority (ORS 409.050) to implement the legislative policies cited above. ORS 427.007, 430.610, *et seq.*

17.

In order to determine a disabled individual's needs, the State of Oregon develops an Individual Support Plan (ISP) for that individual. This is a comprehensive process required by CFC (42 U.S.C. § 1396n(k)(1)(A)(i)) and Oregon statutes (ORS 427.107(2)(j)) that produces a detailed assessment of the level of care an individual will require with specific protocols, safety plans, descriptions of nursing tasks, behavior support plans, and other instructions that attendant caregivers must follow to maintain the individual's health and safety. The ISP will also determine how many hours of care a disabled individual needs. Depending on the nature of the disability, this can be anywhere between a few hours of care per month, up to 48 hours (or more) of care per day for extremely disabled individuals (requiring more than one around-the-clock caregiver each day).

18.

Separate from the development of an individual's ISP, the State of Oregon uses assessment tools which produce a monthly rate for individuals in residential care, or a number of hours of attendant care in the Community Living Supports program (Assessments). Upon information and belief, these Assessments were created before the CFC program was implemented in 2013. These service-level Assessments are out of compliance with the Americans with Disabilities Act and the Medicaid statute (CFC State Plan) because they contain

arbitrary caps on the amount of care hours individuals may require in their authorized ISP. For example:

- Oregon's "Adult Needs Assessment" measures a maximum of 23.86 hours of care per day.

- Oregon's "Support Intensity Scale" measures a maximum of approximately 12 hours of care per day.

- The "Oregon Needs Assessment" measures up to 16.7 hours of care per day.

These Assessments will identify that a person needs assistance with ADLs, IADLs, and health-related tasks, but, unlike an ISP, the assessment fails to assess from an overall perspective of the total amount of care a person will need.

19.

I/DD individuals with high needs, for example, whose ISPs require more than 24 hours per day of attendant care services, have limited opportunity to live independently in a nonresidential setting. Nonetheless, some high-needs individuals, for example the individuals who live with Plaintiffs, make the effort to live on their own.

**B.      Plaintiffs' Advocacy and Caregiving Activities**

20.

SFH is an agency certified by the Oregon DHS to provide attendant care for individuals with I/DD. SFH employs about 30 attendant care staff who provide attendant care in homes and community settings in Oregon. SFH is endorsed by the State of Oregon to provide hourly attendant care through the Community Living Supports program and 24-hour residential care services.

21.

Plaintiff Schrader has been a caregiver for I/DD individuals for 14 years in a variety of settings, including by operating an adult foster care home, two separate 24-hour residential care facilities, and (currently) an attendant care services agency delivering services in the Community Living Supports program. In Schrader's experience, providing attendant care services in a nonresidential setting is preferrable to any form of residential care, for individuals who prefer nonresidential settings, because the nonresidential setting allows the individual to exercise initiative, autonomy, and independence in making life choices.

22.

Furthermore, some individuals prefer not to live with a family member, and the Community Living Supports for nonresidential settings can provide an opportunity to "grow up" by not remaining forever under the roof of the individual's parent or guardian. Placement of such individuals in a residential setting, or in a setting with the individual's family or guardian, can result in increased behavioral challenges, as well as additional strain on caregivers and family members, and, ultimately, additional costs to remediate behaviors. For some individuals with high needs, the opportunity to dwell with a caregiver or other affiliate of the individual's attendant care services provider is their best and only opportunity to live independently.

23.

Before her death in September 2021, AMC was an individual with development disabilities to whom ODDS provided attendant care services in a nonresidential setting through the Community Living Supports program. In or around March 2019, AMC became homeless, and Plaintiff Schrader provided emergency shelter to AMC in Schrader's home. AMC's ISP indicated she needed 53.7 hours of attendant care per day and nursing care support, but ODDS

approved only 26.83 hours of attendant care per day and did not provide nursing care services to AMC. Schrader contacted ODDS to advocate for AMC to receive the nursing care services and additional attendant care hours, but ODDS still did not provide either to AMC. As a result, AMC was hospitalized in or around the end of September 2019. Schrader continued to advocate for AMC including by informing ODDS, including Chelas Kronenberg as a Policy Manager for ODDS, that the state was failing to provide nursing care to AMC to a degree that constituted abuse of a disabled person. The following day, ODDS retaliated by terminating all attendant care hours for AMC from SFH and did not provide any substitute attendant care services for AMC.

24.

In or around October 2019 and as discussed in more detail below, Schrader made multiple attempts to convince ODDS to provide nursing care services and attendant care hours to AMC. Schrader's efforts included moving out of her own home and assigning the deed of her home to a third party, in order to provide access for AMC to her home and attendant care services. AMC could not leave the hospital because she no longer had a home or attendant care services provider to receive her. Plaintiffs paid for AMC's care out of their own pocket when AMC was discharged from the hospital to Schrader's home because ODDS refused to provide *any* attendant care services to AMC in Schrader's home or any alternative setting for AMC. AMC's guardians requested a reasonable accommodation in the form of allowing AMC to live in the Schrader home, which ODDS denied without any interactive process or any consideration given to AMC's needs.

25.

Ultimately, after nearly three months of receiving no supportive care from ODDS, during which time Schrader provided care to AMC at Schrader's own expense, AMC had to move to a

new home, a duplex not owned or occupied by Schrader, in order for ODDS to agree to resume payments for Plaintiff SFH to provide hourly attendant care services to AMC (but not nursing care or all the attendant care hours provided in AMC's ISP). However, because this duplex did not have a roll-in shower—necessary for AMC to shower safely—AMC took a bus to the Schrader home three times a week to take a shower. When Covid began, AMC was unable to wear a mask because it caused respiratory distress, and thus she was unable to ride the bus. AMC's caregivers found the best solution was to give AMC sponge baths over a tarp on the kitchen floor. Plaintiff Schrader again advocated on AMC's behalf by requesting a reasonable accommodation to avoid this humiliating experience by allowing AMC to move back in with Plaintiff Schrader, which ODDS denied without any interactive process or any consideration given to AMC's needs.

26.

In addition to AMC, Plaintiff Schrader has advocated for other individuals with intellectual and developmental disabilities including as set forth in the original complaint (Dkt. 1) and amended complaint (Dkt. 12) in Plaintiffs' companion Case No. 3:22-cv-00945-JR. After years of requesting ODDS to provide adequate attendant care service for high-needs individuals to meet their ISPs without success, Schrader filed Case No. 3:22-cv-00945-JR to challenge Oregon's system for calculating Assessments because that system fails to provide adequate Assessments for I/DD individuals with high-needs ISPs.

**C. Defendants' Responses to Plaintiffs' Activities**

27.

In or around October 2019, the day after Plaintiff Schrader notified ODDS, specifically Chelas Kronenberg as a Policy Manager for ODDS, that the state was failing to provide nursing

care to AMC to a degree that constituted abuse of a disabled person, ODDS responded by stopping all payments to SFH related to AMC's care and issuing Plaintiffs a cease-and-desist letter for a purported licensing violation because Plaintiff Schrader opened her home to AMC and provided care to AMC in Schrader's home. ODDS did not offer AMC any alternative settings for housing or support services.

28.

The licensing violation claimed that because AMC received care from SFH in the Schrader home, Plaintiff SFH was not providing hourly attendant care in the Community Living Supports program but was operating an unlicensed adult foster home. A foster home is a residential setting under ORS 427.101(1)(a), whereas SFH was operating as an "other nonresidential setting" under 427.101(1)(c), the Community Living Supports program. In Oregon, a provider of foster care is required to provide room, board, and 24-hour support services in compliance with OAR 411 Chapter 360. An individual in a foster care setting has no choice to receive room, board, or support from anyone other than the foster care provider.

29.

ODDS's rationale for issuing a licensing violation to Plaintiffs was a pretext because AMC had a choice of where to live and from whom to receive community supports services. She chose to live in Schrader's home and to receive support services from SFH, consistent with the purpose and intent of the Community Living Supports program, with the statutory policy of the State of Oregon, and with the federal policies summarized above in the Integration Mandate. By calling those choices "unlicensed foster care," ODDS *removed* from AMC her freedom to make those choices and acted *contrary* to ODDS's statutory mandate, including ORS 427.121, which

requires that ODDS present three settings options to I/DD individuals receiving disabilities supports.

30.

ODDS's rationale for issuing a licensing violation to Plaintiffs was a pretext also because there are other protections in place for guarding against the dangers of unlicensed foster care without removing from I/DD individuals in nonresidential settings the ability to choose where they live, when and where they take their meals, and from whom they receive care. For example, an individual receiving Community Living Supports can provide their own meals, but an individual in a foster home cannot. An individual receiving Community Living Supports can choose their attendant care provider, but an individual in a foster home cannot. In either setting, if abuse occurs, the individual and/or the individual's guardian can make a complaint. In Community Living Supports, the individual can also simply change care providers, but an individual in foster care cannot. Available data supports this point. Among the individuals with I/DD that ODDS serviced in 2022, approximately 40% were in settings regulated as residential care and approximately 60% were in community supports nonresidential settings. Although the number of individuals in nonresidential care is greater than the number in residential care, that population accounted for only one-third of all substantiated abuse events. In 2022, 120 substantiated abuse events were recorded in regulated residential settings as compared to 59 substantiated abuse events from individuals in community settings. No abuse was reported, much less substantiated, with respect to Plaintiffs. The purported "dangers" of an individual *making their own choice* to live with an employee or affiliate of the individual's community support provider are fiction because the individual in a community supports (nonresidential) setting remains free to choose where they live, what they eat, and from whom they receive support.

31.

In or about October 2019, at the time that ODDS issued a licensing violation to Plaintiffs for purported "unlicensed foster care," AMC was in the hospital because ODDS had refused to provide her with any nursing care supports, contrary to AMC's ISP. ODDS, instead of supporting AMC to "exercise choice and self-determination" and providing supporting services "consistent with the choice of the individuals regarding services, providers, goals and activities" (Oregon's policy in ORS 427.007(1)(a)), withdrew all supportive services from AMC so long as she chose to return to Schrader's home. Instead of empowering AMC to make her own choices, ODDS took away AMC's preferred choice.

**D.    The Promulgation of the Final Rule**

32.

In or about October 2022, Defendants proposed an administrative rule for nonresidential settings to create a new category of settings ("provider-owned") in the Community Living Supports program in which an I/DD individual could not receive attendant care services (Proposed Rule). This category of setting has no predicate in federal policies or in the policies of the State of Oregon. Instead, prohibiting attendant care services in a provider-owned setting mimics the licensing violation issued by ODDS against SFH in response to Schrader's advocacy for AMC in 2019.

33.

Defendants did not give notice of their intended action of adopting the Proposed Rule to persons who had requested notice of ODDS's intended actions pursuant to ORS 183.335(c). Schrader had requested electronic notice of ODDS's intended actions, and had received such notices regularly in the past, but received no such notice of the Proposed Rule. Nor did

Defendants provide notice of their intended action of adopting the Proposed Rule in the manner established by rule adopted by the agency to provide a reasonable opportunity for interested persons to be notified of the agency's proposed action, pursuant to ORS 183.335(1)(a). Schrader had previously reviewed notices of ODDS's intended actions on the ODDS Rules website, *e.g.,* https://www.oregon.gov/odhs/rules-policy/pages/odds-rules.aspx. However, Defendants did not provide notice of the Proposed Rule on the ODDS Rules website.

34.

Around December 20, 2022, Defendants made final the Proposed Rule in OAR 411-450 ("Final Rule").

**E. The Provisions of the Final Rule in OAR 411-450**

35.

Specifically, the Final Rule defined a "provider-owned dwelling," "provider-rented dwelling," and "provider owned, controlled, or operated setting" (together, Provider Setting) which an individual may not choose in order to be eligible for Community Living Supports:

> (6) SETTING LIMITATIONS.
>
> (a) An individual may receive community living supports if the individual:
>
> (A) Resides in a setting the individual owns, leases, or rents or is on the property deed, mortgage, or title.
>
> (B) Resides in a setting, either through an informal arrangement or rental agreement, owned, leased, or rented by a family member.
>
> (C) Has no permanent residence.
>
> (b) An individual is *not eligible* for community living supports, other than DSA, if the individual resides in one of the following:

> (A) A provider-owned dwelling or a provider-rented dwelling through an informal or formal agreement.
>
> (B) A provider owned, controlled, or operated setting.

OAR 411-450-0060(6) (emphasis added).

> (24) "Provider-Owned Dwelling" means a dwelling that is owned by a provider or the provider's spouse, when the provider is proposing to be paid for delivering home and community-based services to an individual, and the provider or the provider's spouse is not related to the individual by blood, marriage, or adoption. A provider-owned dwelling includes, but is not limited to:
>
> (a) A house, apartment, and condominium.
>
> (b) A portion of a house, such as a basement or a garage, even when remodeled to be used as a separate dwelling.
>
> (c) A trailer and mobile home.
>
> (d) A duplex unless the structure displays a separate address from the other residential unit and was originally built as a duplex.
>
> (25) "Provider-Rented Dwelling" means a dwelling that is rented or leased by a provider or the provider's spouse, when the provider is proposing to be paid for delivering home and community-based services to an individual, and the provider or the provider's spouse is not related to the individual by blood, marriage, or adoption.

OAR 411-450-0000(24), (25).

**F. Results of the Final Rule's Restrictions on Nonresidential Settings**

**1. Determining Whether an Individual's Choice of Nonresidential Setting Is Eligible for Community Living Supports**

36.

By excluding the newly defined Provider Settings from the Community Living Supports program, the Final Rule prohibits I/DD individuals from choosing to receive support services from an agency for whom the individual's landlord or landlord's spouse works. The Final Rule

also prohibits I/DD individuals from choosing to live with an owner, owner's spouse, employee, or employee's spouse of an agency from whom the individual receives support services.

### 2. ODDS Has Defined a Provider Setting to Include Nonresidential Settings Contrary to the Federal and Oregon Legislatures' Guidance

37.

This Final Rule discriminates against disabled individuals as well as providers of community living supports for the disabled, such as Plaintiffs (who are aggrieved by these discriminatory practices by the threatened loss of association with the individuals who share their home). This Final Rule treats disabled individuals differently than nondisabled individuals by telling them where they can live and who they can or cannot live with. Nondisabled individuals and disabled individuals who do not need community-based care have no such restrictions.

38.

The Final Rule imposes criteria for accessing Community Living Supports that conflict with the federal Integration Mandate, described above. The Integration Mandate requires that each state administer CFC programs to place disabled individuals in a manner that "ensures an individual's rights of privacy, dignity and respect, and freedom from coercion and restraint." 42 U.S.C. § 1396n(k). Implementing regulations forbid the states to "directly or through contractual or other arrangements, utilize criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability" or that "have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3). "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." *Id.* § 35.130(d). The Final Rule fails to comply with these rules because it forbids I/DD individuals

who chose a nonresidential Provider Setting from receiving any Community Living Supports

services. Plaintiffs are not aware of any other state in the United States that has forbidden

individuals from choosing a nonresidential Provider Setting as the Final Rule has done.

39.

Oregon statute directs DHS, and by designation ODDS, to support I/DD individuals to

"exercise choice and self-determination" and to provide supportive services "consistent with the

choice of the individuals regarding services, providers, goals and activities." ORS 427.007(1)(a).

The Final Rule is inconsistent with this policy because it *removes* from individuals the choice of

receiving Community Living Supports services in a Provider Setting.

40.

Upon information and belief, the promulgation of the rule described above was motivated

in whole or in part by the desire to shut down Plaintiffs' business of caring for I/DD disabled

individuals. Upon information and belief, Defendants wanted to shut down Plaintiff Schrader due

to her advocating on behalf of the disabled individuals under Plaintiffs' care in order to make

sure they receive all the care they require according to their ISPs.

**3.    ODDS Has Enforced Provider Setting to Eviscerate Individual Rights and Autonomy in the Individual's Choice of a Nonresidential Setting**

41.

All of SFH's clients have chosen to live with Schrader or with another SFH employee.

Under the Final Rule, it may be determined that each of SFH's clients have been living for years

in a Provider Setting (indeed ODDS has sent a notice of planned action to this effect). Under this

interpretation, the Final Rule requires SFH's clients to choose to between leaving their chosen

home of multiple years or finding a new provider of attendant care support services. Each of

these individuals has a high-needs ISP and requires the care of five or six highly trained

attendant providers *each*. None of these individuals wants to leave their home.

42.

In 2023, ODDS sent communications to five individuals to whom SFH provides

attendant care services stating that ODDS will not pay for their attendant care services unless

they leave their current home and find new housing. ODDS has not provided these individuals

with alternative housing options or alternative attendant care services.

43.

In February 2023, Plaintiff Schrader asked ODDS for a contact person (or ADA

coordinator) to make an ADA accommodation request but received no response to this request.

44.

In July 2023, Plaintiff Schrader asked Defendants' counsel for a contact person (or ADA

coordinator) to make an ADA accommodation request but received no response to this request

and was told to make the request through Defendants' counsel.

45.

In September 2023, Plaintiff Schrader sent an accommodation request for SFH's clients

to Defendants' counsel, including a request to allow the disabled person to share housing with

whomever they wish, including a caregiver paid to care for the individual. To Schrader's

knowledge, Defendants have not acted on this request.

46.

In December 2023, ODDS sent notices of planned action to five individuals to whom

SFH provides attendant care services stating that ODDS will not pay for their attendant care

services unless they leave their current home and find new housing. ODDS has not provided

these individuals with alternative housing options or alternative attendant care services.

47.

Upon information and belief, the promulgation of the rule described above was motivated

in whole or in part by the desire to shut down Plaintiffs' business of caring for severely disabled

individuals. Upon information and belief, Defendants wanted to shut down Plaintiff Schrader due

to her advocating on the behalf of the disabled individuals under Plaintiffs' care in order to make

sure they receive all the care they require according to their ISPs.

## V.    STANDING

48.

Defendants' Final Rule directly impacts Plaintiffs by threatening to sever Plaintiffs'

association with five I/DD individuals who currently make their home with Plaintiff Schrader or

with an employee of Plaintiff SFH. Defendants' Final Rule also directly impacts Plaintiffs by

prohibiting Plaintiffs from providing Community Living Supports services to the five I/DD

individuals who currently make their home with Plaintiff Schrader or with an employee of

Plaintiff SFH.

49.

Plaintiff Schrader has experienced fear, confusion, and emotional distress caused by

Defendants' arbitrary and heavy-handed actions against Schrader's efforts to help the high-needs

I/DD individuals who live with her and/or with other SFH employees, such actions including

issuing the Final Rule and enforcing it. Few nonresidential care providers are willing to take on

high-needs individuals who live independently outside of their family homes. The ISP for each

of the I/DD individuals who live with Schrader and/or with another SFH employee indicates that

the individual has chosen *not to live in a residential setting (which includes an adult foster home)* but has instead preferred to live in a nonresidential setting, specifically with Plaintiff's Schrader or with another employee of SFH. Schrader has a relationship with each of these individuals, beyond the caregiving relationship. Defendants' refusal to pay for SFH to provide care to these individuals in Schrader's home causes distress to Schrader because it violates the choices of these individuals and harms people to whom Schrader is committed and for whom Schrader has cared with no small sacrifice.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
(Final Rule violates federal law)

50.

Plaintiffs incorporate the allegations of the preceding paragraphs.

51.

Defendants' Final Rule defining a Provider Setting forbids individuals from choosing to receive Community Living Supports benefits in a Provider Setting, in conflict with federal laws. *See supra* 29 U.S.C. § 794; 42 U.S.C. § 1396n(k); *id.* § 12132; *see also* 28 C.F.R. § 35.130(d) ("A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."). This prohibition harms Plaintiffs by requiring Plaintiffs either to disassociate from I/DD individuals who choose to make their home with Plaintiffs or to stop receiving payment for providing Community Living Supports services to such individuals.

52.

As applied, Defendants' enforcement of the Final Rule against Plaintiffs threatens nonpayment and/or a licensing violation against Plaintiffs if Plaintiffs continue to honor the self-

determining choices of the five I/DD individuals who have chosen to make their home with Plaintiff Schrader or with an employee of Plaintiff SFH and to receive Community Living Supports services from Plaintiff SFH. This threat is in conflict with federal laws. *See supra* 29 U.S.C. § 794; 42 U.S.C. § 1396n(k); *id.* § 12132; *see also* 28 C.F.R. § 35.130(d) ("A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.").

**SECOND CLAIM FOR RELIEF**

(42 U.S.C. § 1983 – Violation of Due Process – against individual Defendants only)

53.

Plaintiffs incorporate the allegations of the preceding paragraphs.

54.

Under the Due Process Clause, "[n]o state shall make or enforce any law which shall . . . deprive any person of life, liberty, or property, without due process of law."

55.

On its face, and as applied, the Final Rule imposes costs, contains a penalty, and restricts the right of association for individuals living in a Provider Setting: "(b) An individual is ***not eligible*** for community living supports, other than DSA, if the individual resides in one of the following: (A) A provider-owned dwelling or a provider-rented dwelling through an informal or formal agreement. (B) A provider owned, controlled, or operated setting." OAR 411-450-0060(6) (emphasis added).

56.

On its face, and as applied, the Final Rule also imposes costs, contains a penalty, and restricts the right of association for Plaintiffs by forcing them to remove their association with

individuals receiving Community Living Support services from Plaintiff SFH and living in a Provider Setting of either Plaintiff.

57.

On its face, and as applied, the Final Rule violates Medicaid's "free-choice-of-provider requirement," by removing from SFH's clients the right to obtain assistance from any person qualified to provide such services. *See Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960, 963 (9th Cir. 2003). SFH is certified and endorsed to deliver Community Living Supports Services, and but for the Final Rule, the individuals living with Schrader and/or SFH employees would continue to obtain Community Living Supports Services from SFH in the future, as they have for years preceding.

58.

At all relevant times, Defendants acted under color of state law when engaged in rulemaking, promulgating, and enforcing the Final Rule. Specifically, Defendant Pakseresht was exercising the authority given to him by the State of Oregon, and his actions (and those of his delegees in ODDS) were taken with the appearance that the State of Oregon authorized them.

59.

Defendant Pakseresht's official conduct as the director of DHS, in administering and enforcing the Final Rule, has deprived Plaintiffs and Plaintiffs' clients of their rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as described above.

60.

Plaintiffs are entitled to (1) a declaration that the Final Rule is unconstitutional, in violation of the Due Process Clause of the Fourteenth Amendment to the United States

Constitution; and (2) prospective injunctive relief, prohibiting Defendant Pakseresht from continuing to administer and enforce the Final Rule.

**THIRD CLAIM FOR RELIEF**
(Failure to make a reasonable accommodation under the FHA)

61.

Plaintiffs incorporate the allegations of the preceding paragraphs.

62.

Defendants' Final Rule withholds Community Living Supports from individuals who choose to live in a Provider Setting. The Final Rule harms Plaintiffs by causing Plaintiffs to lose the companionship of individuals who have chosen to make their home with Plaintiffs and to receive Community Living Supports services from Plaintiffs.

63.

A reasonable accommodation to Defendants' Proposed Rule would be to allow I/DD individuals to receive Community Living Supports care in a nonresidential setting of their choosing, including a Provider Setting. A reasonable accommodation to Defendants' Proposed Rule would be to allow the individuals who have chosen to make their home in a house of Plaintiff Schrader or of an employee of Plaintiff SFH and to receive Community Living Supports services from Plaintiff SFH to continue to live in their respective homes and receive services from a Community Living Supports agency of their choosing. Plaintiffs made an accommodations request, but ODDS did not grant the request or even apparently conduct a review of the accommodations request. Failure to allow such a reasonable accommodation constitutes discrimination under federal law, including under the Fair Housing Act.

**FOURTH CLAIM FOR RELIEF**
(Discrimination 42 U.S.C. § 12132 — against all Defendants)

64.

Plaintiffs incorporate the allegations of the preceding paragraphs.

65.

The ADA protects disabled individuals from denial of eligibility for services or programs because denial of eligibility means denial of access to the supports that are necessary for the disabled person to function in society as a person without disabilities. "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S. Code § 12132

66.

The Final Rule discriminates against disabled individuals by reason of their disability by denying I/DD individuals who are otherwise eligible for Community Living Supports the choice of living in a Provider Setting. Individuals who are not disabled are able to choose to live in a Provider Setting.

67.

Defendants have used the Final Rule to deny access of individuals, including those described herein, to the living setting of their choosing or else forfeit their access to benefits of the services in the Community Living Supports program.

68.

The restrictions of the Final Rule violate the Integration Mandate, which is a form of discrimination under Title II of the ADA, because it prevents individuals who are disabled from having access to the services that would enable them to make choices about where they live, as

non-disabled persons do. Therefore, the restrictions imposed by the Assessment System are imposed *on account of the individual's disability* and constituted discrimination on the basis of disability.

69.

The Final Rule harms Plaintiffs by causing Plaintiffs to lose the companionship of individuals who have chosen to make their home with Plaintiffs and to receive Community Living Supports services from Plaintiffs.

**FIFTH CLAIM FOR RELIEF**
(Retaliation 42 U.S.C. § 12203 – against all Defendants)

70.

Plaintiffs incorporate the allegations of the preceding paragraphs.

71.

Plaintiffs have advocated on the behalf of disabled individuals for years, including by challenging the Oregon Assessments system because it deprives high-needs I/DD individuals of necessary care, including AMC and other individuals as alleged herein. This advocacy is protected speech under the First Amendment to the U.S. Constitution. This advocacy is also protected by from retaliation by statute because it opposes an unlawful act of Defendants, namely the use of Oregon's Assessments system to deny necessary services to high-needs I/DD individuals.

72.

The promulgation of the rule described above constitutes retaliation against Plaintiffs due to their advocacy on the behalf of disabled individuals.

73.

The Final Rule is retaliatory against Plaintiffs because it enshrines ODDS's retaliatory
action in October 2019 against Plaintiffs' advocacy for AMC, by removing from individuals the
freedom to choose to receive Community Living Supports in a Provider Setting, *contrary* to
ODDS's statutory mandate, including ORS 427.007.

74.

Defendants' actions, including promulgating and enforcing the Final Rule, have harmed
Plaintiffs because the Final Rule threatens to deny reimbursement for Community Living
Supports service hours and/or issue a licensing violation against Plaintiffs if Plaintiffs continue
to honor the self-determining choices of the five I/DD individuals who have chosen to make their
home with Plaintiff Schrader or with an employee of Plaintiff SFH and to receive Community
Living Supports services from Plaintiff SFH.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

- A declaration that the Final Rule, namely OAR 411-450-0060(6) and
  411-450-0000(24), (25), is unconstitutional, arbitrary and capricious, retaliatory,
  discriminatory, and void;

- A permanent injunction prohibiting the State of Oregon from implementing OAR
  411-450-0060(6) and 411-450-0000(24), (25);

- Damages caused by Defendant Pakseresht's violations of law, in an amount to be
  proved at trial;

- Plaintiffs' reasonable costs and attorney fees associated with bringing this action, pursuant to 42 U.S.C. § 1983, *id.* § 12205, and/or *id.* § 3613(c)(2), and/or 29 U.S.C. § 794a(a); and
- Any and all other relief the Court deems just and reasonable under the circumstances.

DATED: January 23, 2024

STOEL RIVES LLP

*/s/ Elliott J. Williams*

ELLIOTT J. WILLIAMS
elliott.williams@stoel.com
*Attorneys for Plaintiffs*